**SO ORDERED.**

**SIGNED this 23 day of September, 2016.**

David M. Warren
United States Bankruptcy Judge

---

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

IN RE:                                                    CASE NO. 14-03283-5-DMW

DOREEN SUSAN BAUM,

        DEBTOR                                        CHAPTER 7

---

| | |
|---|---|
| MARTIN BAUM,<br><br>      PLAINTIFF<br><br>vs.<br><br>DOREEN SUSAN BAUM,<br><br>      DEFENDANT | ADVERSARY PROCEEDING NO.<br><br>14-00044-5-DMW |

### MEMORANDUM OPINION AND JUDGMENT

This matter comes before the court upon the Amended Complaint of Martin Baum ("Plaintiff") filed on February 2, 2015, seeking the determination that Doreen Susan Baum ("Defendant") is liable to the Plaintiff for two counts of fraud ("Fraud Claims"), and that such indebtedness is excepted from the Defendant's Chapter 7 discharge pursuant to 11 U.S.C. §

523(a)(15)[1] ("Dischargeability Claim").  The court conducted a trial ("Trial") on February 11, 2016 in Raleigh, North Carolina.  Joseph H. Nanney, Esq. appeared on behalf of the Plaintiff, and Christian Bennett Felden, Esq. appeared on behalf of the Defendant.  At the conclusion of the Trial, the court orally granted judgment ("Judgment") in favor of the Defendant with respect to the Dischargeability Claim, without making a specific determination of liability with regard to the Fraud Claims.  This Opinion sets forth the court's findings of fact and conclusions of law in support of its Judgment.

## FINDINGS OF FACT

At the Trial, the Plaintiff testified on his own behalf and introduced nine (9) exhibits which the court admitted into evidence.  In defense, the Defendant and Mary Gurganus, Esq. ("Gurganus") testified, and the Defendant introduced seven (7) exhibits which the court admitted into evidence.  After considering the evidentiary testimony and exhibits in concert with the court's record of both this adversary proceeding ("AP") and the Defendant's underlying bankruptcy proceeding ("Bankruptcy"), the court finds the facts to be as follows:

### The Marriage

1.      The Plaintiff and the Defendant (collectively "Parties") were married on September 24, 1988.  Two children, who are both now emancipated, were born of the marriage.

2.      During the marriage, the Plaintiff was the predominant income earner, and the Defendant was primarily responsible for managing the Parties' financial affairs.  The Plaintiff relied upon the Defendant to oversee the payment of household expenses, and the Plaintiff rarely reviewed their financial records.

---

[1] Further references to the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, other than formal citations, shall be by section number only.

3.    In the years 2008 through 2010, the Plaintiff was employed as president and chief executive officer of Turnberry Development, LLC ("Turnberry"), a real estate development company.  The Plaintiff's income fluctuated based upon the real estate market, which was not lucrative during this time period.  The Plaintiff's only consistent source of income was $20,000.00 per month received from Turnberry as repayment for a loan, but this income ceased mid-year in 2009 after the loan was paid in full.  The termination of this supplemental income, in combination with the real estate recession, put a previously unexperienced strain on the Parties' finances.

4.    The Parties held substantial stock the Plaintiff's prior business, Accentia Biopharmeceuticals, Inc. ("Accentia").  This stock became worthless in or around 2009 upon the Federal Drug Administration disapproving an Accentia product, further deteriorating the Parties' financial situation.

<u>IRA Transactions</u>

5.    The Plaintiff maintained at least two Individual Retirement Accounts with First Citizens Bank ("First Citizens"), account number XXXXXX340 ("First IRA") and account number XXXXXX849 ("Second IRA") (collectively "IRAs").[2]  In early 2009, the combined value of the IRAs was approximately $350,000.00.

6.    In order to meet expenses, the Plaintiff would occasionally authorize the Defendant to withdraw funds from the IRAs.

7.    On or about March 5, 2009, the Defendant completed an IRA Distribution Request form and a Fax Transmittal form (collectively "March 5th Forms") directing the transfer of $20,000.00 from the First IRA to the Parties' joint checking account ("First Citizens Checking Account") with First Citizens.  The Plaintiff signed each of the March 5th Forms, and the

---

[2] In the pleadings and at the Trial, the Parties referred to the IRAs as being 401(k) accounts; however, it is unclear to the court whether the IRAs qualify under 26 U.S.C. § 401(k).

Defendant faxed the March 5th Forms to First Citizens.  On March 11, 2009, the amount of $20,000.00 ("March 11th Withdrawal") was withdrawn from the First IRA and deposited to the First Citizens Checking Account.  The Plaintiff authorized the March 11th Withdrawal.

8.    On or about April 2, 2009, the Defendant altered the March 5th Forms containing the Plaintiff's signature to reflect the date of April 2, 2009.  The Defendant faxed these altered March 5th Forms to First Citizens, and on April 7, 2009, the amount of $20,000.00 ("April 7th Withdrawal") was withdrawn from the First IRA and deposited to the First Citizens Checking Account.  The Plaintiff did not authorize the April 7th Withdrawal.

9.    On or about April 28, 2009, the Defendant again altered the March 5th Forms containing the Plaintiff's signature to reflect the date of April 28, 2009.  The Defendant faxed these altered March 5th Forms to First Citizens, and on April 29, 2009, the amount of $20,000.00 ("April 29th Withdrawal") was withdrawn from the Second IRA[3] and the amount of $19,980.00[4] was deposited to the First Citizens Checking Account.  The Plaintiff did not authorize the April 29th Withdrawal.

10.    On June 5, 2009, the amount of $20,000.00 ("June 5th Withdrawal") was withdrawn from the First IRA and deposited to the First Citizens Checking Account.  The Plaintiff did not authorize the June 5th Withdrawal.

11.    On June 23, 2009, the amount of $30,000.00 ("June 23rd Withdrawal") was withdrawn from the First IRA and deposited to the First Citizens Checking Account.  The Plaintiff did not authorize the June 23rd Withdrawal.

---

[3] The April 29th Withdrawal was made from the Second IRA even though the altered March 5th Forms request withdrawal from the First IRA.

[4] The account records for the Second IRA indicate that a wire transfer fee in the amount of $20.00 was deducted from the April 29th Withdrawal.

12.     On July 14, 2009, the amount of $30,000.00 ("July 14th Withdrawal") was withdrawn from the First IRA and deposited to the First Citizens Checking Account.  The July 14th Withdrawal was not specifically addressed in the Pleadings or at the Trial.

13.     On July 31, 2009, the amount of $30,000.00 ("July 31st Withdrawal") was withdrawn from the First IRA and deposited to the First Citizens Checking Account.  The July 31st Withdrawal was not specifically addressed in the Pleadings or at the Trial.

14.     On August 27, 2009, the amount of $30,000.00 ("August 27th Withdrawal") was withdrawn from the First IRA and deposited to the First Citizens Checking Account.  The August 27th Withdrawal was not specifically addressed in the Pleadings or at the Trial.

15.     The Plaintiff admitted into evidence copies of an IRA Distribution Request form and a Fax Transmittal form (collectively "September 7th Forms") which direct the transfer of $30,000.00 from the Second IRA to the First Citizens Checking Account.  The September 7th Forms contain an obviously altered date of September 7, 2009 and a forged signature of the Plaintiff, and the Plaintiff contends that $30,000.00 ("Alleged September 7th Withdrawal") was withdrawn from one of the IRAs by use of the September 7th Forms.  Neither the IRAs' records ("IRA Records") nor First Citizens Checking Account statements ("Statements") admitted as evidence indicates that any withdrawal was made from either of the IRAs on or around September 7, 2009.[5]

16.     On or about September 17, 2009, the Plaintiff completed and signed an IRA Distribution Request form and a Fax Transmittal form directing the transfer of $17,000.00 from the Second IRA to the First Citizens Checking Account.  The IRA Records do not reflect a withdrawal in the amount of $17,000.00 on or around September 17, 2009; however, the amount

_____

[5] The court recognizes that the amount of each of the unexplained July 14th Withdrawal, July 31st Withdrawal, and August 27th Withdrawal matches the amount of the Alleged September 7th Withdrawal.

of $17,000.00 ("September 17th Deposit") was deposited into the First Citizens Checking Account on September 17, 2009. If the September 17th Deposit did come from either of the IRAs, then the Plaintiff authorized the withdrawal.

17.     The Defendant contends that the Plaintiff was aware that she was making periodic withdrawals from the IRAs in order to meet family expenses and that she only altered forms when blank ones were unavailable.

Tax Liability

18.     Withdrawals from the IRAs made during 2009 resulted in income tax liability for the Plaintiff, including early withdrawal penalties, because the Plaintiff was under the age of fifty-nine and one-half (59 ½) during 2009.

19.     The Plaintiff did not file timely income tax returns for 2009 with either the Internal Revenue Service ("IRS") or the North Carolina Department of Revenue ("NCDOR").[6]   On October 21, 2014, the IRS issued a Final Notice of Intent to Levy and Notice of Your Right to a Hearing to the Plaintiff that reflected that the total amount of federal tax due for 2009, including accrued interest, was $144,210.68.

20.     The Plaintiff settled his 2009 tax liability with the IRS for the amount of $37,293.10 ("2009 Federal Taxes"). In addition, the Plaintiff's tax liability to the NCDOR for 2009 was $2,143.48 ("2009 State Taxes"). The Plaintiff did not provide copies of his tax returns or any other evidence that reflects what portions, if any, of the 2009 Federal Taxes and the 2009 State Taxes are attributable to withdrawals from the IRAs.

---

[6] Even though the parties were married during all of 2009, the Defendant filed individual tax returns for that year.

<u>Beach Property</u>

21.     During their marriage, the Parties and the Plaintiff's parents owned jointly a beach house ("Beach House") located in Emerald Isle, North Carolina.  The Beach House was rented to vacationers, and during 2009 and 2010, the Defendant was responsible for collecting the rental income ("Beach Income") from the Beach House.  The Beach Income was to be applied toward payment of a mortgage loan ("Beach Mortgage") encumbering the Beach House and other expenses related to the Beach House.

22.     On or about August 9, 2009, the Defendant received a check ("August 9th Check") in the amount of $3,380.00 which was issued by Robert Fuller Fleming and made payable jointly to the Parties.  The August 9th Check represented payment for rental of the Beach House for the week of September 20 – 27, 2009.  The Defendant indorsed personally and forged the Plaintiff's indorsement on the August 9th Check.  On August 13, 2009, the Defendant deposited the August 9th Check into the First Citizens Checking Account and contemporaneously withdrew $3,380.00 ("August 13th Withdrawal") in cash from the First Citizens Checking Account by means of a counter check.  There is no evidence regarding what the Defendant did with the August 13th Withdrawal.  Other than the August 9th Check, there is no evidence detailing receipt of Beach Income related to rentals of the Beach House during 2009.

23.     In late 2009, at the Plaintiff's suggestion that all Beach Income be segregated in a separate account, the Defendant opened a checking account ("BB&T Checking Account") with Branch Banking & Trust Company for this purpose.  The Plaintiff was not an authorized account holder of the BB&T Checking Account.

24.     The Defendant's Exhibit 6 admitted into evidence is a spreadsheet ("2010 Beach Income Spreadsheet") prepared by the Defendant which details receipts of Beach Income related

to rentals of the Beach House during 2010, including refundable security deposits. The 2010 Beach Income Spreadsheet reflects that Beach Income received on or prior to January 6, 2010 was deposited in the First Citizens Checking Account, and Beach Income received after January 6, 2010 was deposited in the BB&T Checking Account.[7]

25.    In late 2010, the Plaintiff became aware that the Beach Mortgage was in default, and the mortgagee had initiated foreclosure proceedings ("Foreclosure") against the Beach House. There is no evidence detailing the precise timing and amount of the default under the Beach Mortgage.

26.    In his testimony, the Plaintiff asserted that the Defendant confessed under oath during their divorce proceedings that she converted $54,000.00 ("Alleged Beach Income Conversion") of Beach Income to her personal use. At the Trial, the Defendant admitted that the Parties' financial difficulties often prevented her from paying timely the Beach Mortgage; however, the Defendant denied that she converted any Beach Income to her personal use or that she stated this during the divorce proceedings.

Expenses

27.    In 2009, the Parties' household expenses were between $35,000.00 (Plaintiff's estimate) and $50,000.00 (Defendant's estimate) per month.

28.    The Statements for the First Citizens Checking Account range from November 11, 2008 through March 8, 2010 and reflect what appear mostly to be payments for general household expenses.

---

[7] The 2010 Beach Income Spreadsheet also reflects three (3) instances where Beach Income was not deposited into either the First Citizens Checking Account or the BB&T Checking Account. On November 17, 2009 and January 8, 2010, Beach Income was deposited into "Trust;" however, the Defendant's testimony did not explain what this meant. In addition, on an unknown date, the Plaintiff received and retained Beach Income related to a rental for the week of August 8 – 15, 2010.

29.     For the months of December, 2008 through October, 2009, the Statements show online monthly payments from the First Citizens Checking Account in the amount of $6,556.24 ("Citimortgage Payments") to Citimortgage and in the approximate amount of $4,850.00 ("Online Loan Payments")[8] to "Loan Payment Online."

<u>Credit Card Payments</u>

30.     The Statements reflect that, in addition to paying general household expenses, the Defendant was using the First Citizens Checking Account to make payments on several credit card accounts ("Credit Cards").  During 2009, the following amounts were paid on the Credit Cards:

| | |
|---|---:|
| American Express | $   9,494.53 |
| Chase/Bank One | 724.00 |
| Chase Card | 12,347.00 |
| Citicorp Choice | 12,480.51 |
| Discover Card | 23,797.00 |
| TOTAL | $  58,843.04 |

31.     The Plaintiff suggested, and the Defendant did not deny, that the Credit Cards were personal accounts of the Defendant; however, no evidence was presented regarding exactly which of the Credit Cards were in the Defendant's name only.  There is also no evidence of the types of charges being made by the Defendant on the Credit Cards in and around 2009.

<u>The Divorce</u>

32.     Beginning in or around April, 2009, the Parties ceased sharing a bedroom, but both continued to reside in their marital home for the remainder of 2009.  They officially separated on or about January 6, 2010 when the Defendant moved out of the residence.

33.     After the Parties separated, their use of the First Citizens Checking Account dropped dramatically.

---

[8] The Online Loan Payments are for the amount of $4,831.72 for the months of December, 2008 through March, 2009 and for the amount of $4,854.84 for the months of April through October, 2009.

34.    At the time the Parties separated, the Defendant was working as a yoga instructor, charging clients $6.00 per session.  The Defendant estimates she earned $3,000.00 during 2010.

35.    In 2010, the Defendant initiated divorce proceedings against the Plaintiff in the District Court of Wake County, North Carolina, File Number 10-CVD-4404 ("Divorce Action"). In or around this time, the Defendant retained Gurganus to represent her in the Divorce Action and paid Gurganus a retainer in the amount of $50,000.00 ("Retainer").

36.    In the Divorce Action, the Parties were granted an absolute divorce on April 8, 2011.

37.    On April 28, 2014, a Consent Order for Alimony and Arrears ("Alimony Consent Order") was entered in the Divorce Action.  The Alimony Consent Order, which was signed by and with the consent of the Parties, requires the Plaintiff to make a lump sum payment to the Defendant in the amount of $35,000.00 plus monthly payments to the Defendant in the amount of $2,600.00 for a period not to exceed six (6) years.[9]  The Alimony Consent Order fully resolved all support claims between the parties, "including but not limited to post separation support, alimony, child support, temporary child support, arrearages owed under support theory, and related attorney's fees."

38.    Also on April 28, 2014, a Consent Order for Equitable Distribution and Judgment ("Equitable Distribution Consent Order") was entered in the Divorce Action.  The Parties each signed and consented to the Equitable Distribution Consent Order with the intent to resolve their "claims for equitable distribution in their entirety."  The Equitable Distribution Consent Order sets forth numerous findings of fact, several of which are excerpted verbatim as follows:

---

[9] The Plaintiff's obligation to make monthly payments to the Defendant terminates on the first to occur of the following: death of either party; cohabitation or remarriage of the Defendant; or the expiration of seventy-two (72) months from the date the first monthly payment became due.

10

The parties' marital estate consists primarily of extensive debt well in excess of $5,000,000.00.   This debt has been reduced to liens, judgments, collection agreements and other debt collection efforts against the parties both jointly and individually in certain cases.  Neither party has the ability to satisfy the judgments against him or her, nor hold the other party harmless, nor indemnify the other party from these debts.

Most of the parties' significant assets have been repossessed, sold, foreclosed upon or otherwise distributed to the parties' satisfaction.  The parties have no significant tangible marital assets remaining except for a majority interest in [the Beach House].  [Plaintiff's] parents are the minority owners of said property.  Said property is secured by a first mortgage in favor of Caliber Home Loans, in the total amount of $999,000.00 and a second in favor of First Citizen's [sic] Bank which includes the consolidation of other debts owed by the parties in excess of $800,000.00.  Said property may also be subject to other various encumbrances, judgments, liens, etc.  [Plaintiff] is not able to hold [Defendant] harmless and indemnify her for said debts and encumbrances, nor remove her from liability for said debts at this time.  The property has been listed for sale and all offers received would result in a significant deficiency.

The terms and conditions set forth in the decretal section of this order are fair and equitable, and both parties are able to comply with the terms set forth therein.

39.     The Equitable Distribution Consent Order incorporates by reference all findings of fact into its conclusions of law, and the decretal section orders, *inter alia*, that each of the Parties shall receive as their sole and separate property the following property in their sole name:  all personal property, proceeds, retirement, accounts, vehicles or other tangible or intangible property; all debt including, but not limited to, credit cards, judgments, liens, charge or credit lines, and all other debt and liability; and medical bills.  In addition, the decretal section contains the following provisions which are excerpted verbatim:

The parties are free to negotiate, discharge or otherwise address the debt in the names of the parties individually and jointly as he or she deems appropriate, including but not limited to filing a bankruptcy petition.

Each party hereby waives all claims against each other for indemnification, subrogation or other theory which would give rise to or create civil claims against

11

the other for joint or individual debts ["Anti-Indemnity Clause"].  Waiver of future claims [Claims Waiver].[10]

[Plaintiff] is hereby distributed [the Beach House] and [Defendant] shall execute a Quitclaim Deed in favor of [Plaintiff] simultaneously with the entry of this Order and Judgment.  The Deed shall be held in escrow with Mary Gurganus until [Defendant] is discharged from the debt associated with the first mortgage and the First Citizens encumbrance, or her name is otherwise removed from said debt. [Plaintiff] shall use her [sic] best efforts to be promptly discharged from said debt. [Defendant] shall cooperate with [Plaintiff] in the negotiation or other disposition of said property and execute documents to this end; [Defendant] shall not unreasonably withhold her signature from documents necessary to accomplish any such transactions.  [Plaintiff] shall use his best efforts to make payment of the mortgage, utilities, maintenance, taxes and insurance associated with said property. [Plaintiff] shall take no action to intentionally further encumber said property.  It is not the intent of the parties . . . that all debts secured by said property are allocated to [Plaintiff], only that he shall make his best efforts to address the costs associated with ownership of said property.  The parties further recognize that this property may be subject to partition, foreclosure, sale or other disposition, however, [Defendant] [sic][11] shall not make any effort to partition this property unless required by law to do so.  The parties recognize that it is likely that [Defendant] will file for bankruptcy protection in an effort to discharge debts including the debts which encumber the beach property.  It is not the intent of the parties to create rights against each other with respect to said property and that the parties are free to discharge, pay, negotiate or otherwise address the debts which encumber the property as he or she deems appropriate.

[Plaintiff] is distributed all businesses in his name or in which he has any interest including but not limited to assets and liability associated with Vestiq LLC. [Defendant] shall have no interest or liability associated with said interests, entities or ventures.

For the portion allowable under Federal and State tax law, [Defendant] is entitled to claim 42% of the beach house losses for the taxable years 2010, 2011, 2012, and 2013 on her federal and state tax returns.

40.    During negotiations of the Alimony Consent Order and the Equitable Distribution Consent Order (collectively "Domestic Consent Orders"), the Plaintiff was aware that the Defendant had made unauthorized withdrawals ("Unauthorized IRA Withdrawals") from the IRAs

---

[10] The Claims Waiver follows the Anti-Indemnity Clause and is typed in a different font and size than the rest of the text of the Equitable Distribution Consent Order.

[11] This provision logically should apply to the Plaintiff and not the Defendant, because the Plaintiff obtained ownership of the Beach House.

and had not always used the Beach Income to pay the Beach Mortgage.  Based upon the negotiations and the advice of his attorneys and financial advisors, the Plaintiff believed that any civil causes of action that he might have against the Defendant with respect to the Unauthorized IRA Withdrawals and the Beach Income were "separate matters" that he would retain after entry of the Domestic Consent Orders.  Conversely, the Defendant and Gurganus believed that the Domestic Consent Orders resolved any and all claims that the Parties might have against each other.

41.     As reflected in the Equitable Distribution Consent Order, no money remained in either of the IRAs at the time the Domestic Consent Orders were negotiated.

<u>Bankruptcy Filing and Adversary Proceeding</u>

42.     On June 6, 2014, the Defendant initiated the Bankruptcy by filing a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code ("Code"), and the court appointed Gregory B. Crampton ("Trustee") to administer the case pursuant to § 704.  On June 6, 2014, the court issued a Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadline which established September 8, 2014 ("Dischargeability Bar Date") as the "Deadline to Object to Debtor's Discharge or to Challenge Dischargeability of Certain Debts."

43.     The Defendant's Schedule F—Creditors Holding Unsecured Nonpriority Claims ("Schedule F") lists the Plaintiff as an unsecured creditor with the amount of claim being "unknown."  Other creditors included on Schedule F are Caliber Home Loans for "Home Loan Beach house" and Citibank Mortgage for "Home Loan" ("Home Mortgage").

44.     On or about July 11, 2014, the Trustee received $10,000.00 from the Defendant which represented an amount of the Retainer that had been returned from Gurganus to the

Defendant.  On or about January 30, 2015, the Trustee received from Gurganus the remaining portion of the Retainer held by Gurganus in the amount of $30,359.40.

45.     On September 10, 2014, the court entered a Discharge of Debtor ("Discharge") which granted the Debtor a discharge pursuant to § 727.

46.     On October 14, 2014, the Plaintiff initiated the AP by filing a Complaint against the Defendant.  In the Complaint, the Plaintiff asserted the Fraud Claims, seeking a determination that the Defendant is indebted to the Plaintiff for compensatory and punitive damages for fraudulently diverting funds from the couple's marital assets through the Unauthorized IRA Withdrawals and misuse of the Beach Income Property.  In the Dischargeability Claim, the Plaintiff requested that this alleged liability be declared non-dischargeable; however, the Complaint did not identify the statutory basis for the Dischargeability Claim.

47.     On October 16, 2014, the Plaintiff filed a Proof of Claim ("Claim 10") in the Bankruptcy for the amount of $134,000.00.  Claim 10 states that the basis for the claim is "[f]raudulent use of funds belonging to [the Plaintiff]."

48.     On November 10, 2014, the Defendant filed in the AP Defendant's Motion to Dismiss Adversary Complaint ("Motion to Dismiss").  In the Motion to Dismiss, the Defendant asserted that the Complaint should be dismissed, because it was not filed prior to the Dischargeability Bar Date.  In his Response to the Motion to Dismiss filed on December 1, 2014, the Plaintiff asserted that regardless of whether the Fraud Claims were discharged, he was entitled to have the Fraud Claims adjudicated, so that he could be paid from the Defendant's bankruptcy estate pursuant to Claim 10.

49.     The court conducted a hearing on January 13, 2015 and granted orally the Motion to Dismiss, because the Complaint did not sufficiently allege the grounds for which the Fraud

Claims were purportedly non-dischargeable; however, the court granted the Plaintiff leave to amend his Complaint. The court's ruling was formally set forth in an Order Allowing Motion to Dismiss and Granting Plaintiff Leave to Amend the Complaint ("Leave Order") entered on March 20, 2015. In the Leave Order, the court noted that, pursuant to § 523(c) and Rule 4007(c) of the Federal Rules of Bankruptcy Procedure, the Dischargeability Bar Date applies only to dischargeability determinations of debts under §§ 523(a)(2), (4) or (6),[12] because unless specifically adjudicated non-dischargeable, such debts are discharged.

50.    On January 20, 2015, the Trustee filed in the Bankruptcy an Objection to Claim ("Claim 10 Objection") with respect to Claim 10. The stated basis for the Claim 10 Objection was that there was no supporting documentation attached to Claim 10.

51.    On February 2, 2015, the Plaintiff filed his Amended Complaint in the AP. The Amended Complaint restates the Fraud Claims and amends the Dischargeability Claim to request that the court declare the Defendant's alleged liability under the Fraud Claims non-dischargeable pursuant to § 523(a)(15).

52.    On February 20, 2015, the Plaintiff filed in the Bankruptcy a Response to the Claim 10 Objection, attaching a copy of the Amended Complaint as evidence of a contingent claim against the Defendant. On May 27, 2015, the court entered an Order Denying Objection to Claim which denied the Claim 10 Objection without prejudice, finding that the Claim 10 Objection was premature pending the outcome of the AP.

---

[12] At the hearing on the Motion to Dismiss, the Defendant postulated that, based upon the allegations set forth in the Fraud Claims, the Dischargeability Claim appeared to have be brought under §§ 523(a)(2) and (4) which respectively except from discharge debts "obtained by false pretenses, a false representation, or actual fraud . . . [and] for fraud or defalcation while acting in a fiduciary capacity . . . ." 11 U.S.C. § 523(a).

53.     On June 1, 2015, the Defendant filed in the AP Defendant's Answer to Amended Adversary Complaint and Affirmative Defenses ("Answer").[13]   In the Answer, the Defendant denies liability to the Plaintiff under the Fraud Claims and denies that any such liability is non-dischargeable under § 523(a)(15).

54.     After completion of discovery in the AP and prior to the Trial, the Plaintiff and the Defendant filed jointly a Pretrial Order on February 10, 2016.  The Pretrial Order contains several stipulations of the parties, including that the AP is a core proceeding over which the court has subject matter jurisdiction.

55.     At the Trial, the Plaintiff asserted that the Defendant is liable to him under the Fraud Claims for the following alleged damages:

| | | |
|---|---|---:|
| April 7th Withdrawal | $ | 20,000.00 |
| April 29th Withdrawal | | 20,000.00 |
| June 5th Withdrawal | | 20,000.00 |
| June 23rd Withdrawal | | 30,000.00 |
| Alleged September 7th Withdrawal | | 30,000.00 |
| 2009 Federal Taxes | | 37,042.61 |
| 2009 State Taxes | | 2,143.38 |
| Alleged Beach Income Conversion | | 54,000.00 |
| TOTAL | $ | 213,185.99 |

## CONCLUSIONS OF LAW

### Jurisdiction

In deciding whether to first address the Fraud Claims or the Dischargeability Claim, the court is faced with a chicken and egg situation in that the outcome of each claim alone could affect the necessity of addressing the other.  If the court determines that the Defendant is not liable to the Plaintiff under the either of Fraud Claims, then there is no debt for determination of

---

[13] Prior to filing her Answer, the Defendant again moved for dismissal of the AP; however, the court denied the motion.

dischargeability.   Contrarily, if the court determines the Fraud Claims, as asserted, are dischargeable obligations, then the need to fully adjudicate and liquidate the Fraud Claims likewise becomes unnecessary.  The court concludes that it is more appropriate first to adjudicate the Dischargeability Claim, because without a determination of non-dischargeability, the court's jurisdiction over the Fraud Claims is questionable.

Although jurisdictional issues were not raised by the parties, the court is under an independent obligation to examine its own jurisdiction. *Bush v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 124 F. Supp. 3d 642, 655-56 (E.D.N.C. 2015) (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231, 110 S. Ct. 596, 607, 107 L.Ed.2d 603 (1990)).  The Dischargeability Claim constitutes a core proceeding which the court has statutory authority to hear and determine pursuant to 28 U.S.C. § 157(b)(2)(I). *See Kelly v. U.S. Dept. of Educ. (In re Kelly)*, 548 B.R. 99, 101 (Bankr. E.D.N.C. 2016) (citation omitted) (noting action to determine dischargeability of a debt is a core proceeding).  The Fraud Claims, as pleaded in the Amended Complaint, appear to be rooted in state tort common law.  Standing alone, these types of claims constitute non-core proceedings over which the court has limited, if any, jurisdiction.[14]

Even as non-core matters, the Fraud Claims may be heard and determined by this court with the consent of the parties if "related to" the Bankruptcy. 28 U.S.C. § 157(c).  "[T]he test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that*

---

[14] A full examination of the court's potential jurisdiction over the Fraud Claims involves a myriad of issues.  For example, while the Fraud Claims are non-core on their face, a determination of their allowance or disallowance as claims against the estate as set forth in Claim 10, for purposes of distribution, is a core proceeding *unless* such determination presents "the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims . . . ." 28 U.S.C. § 157(b)(2)(B).  There is a wide disparity in opinion as to what constitutes a "personal injury tort."  This district does not limit the term to only those claims involving bodily injury. *See, e.g., Moore v. Idealease of Wilmington*, 358 B.R. 248, 251-52 (E.D.N.C. 2006) (holding that civil rights actions brought under 42 U.S.C. §§ 1981 and 1982 constitute personal injury torts within the meaning of 28 U.S.C. § 157(b)(2)(B)).  The court questions whether this liberal construction would also encompass torts such as the Fraud Claims which are more financial in nature and involve property rights.  The court need not engage in this analysis, because the AP does not involve a determination of the allowance or disallowance of Claim 10.

proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Owens-Illinois, Inc. v. Rapid Am. Corp. (In re Celotex Corp.)*, 124 F.3d 619, 625 (4th Cir. 1997) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)) (emphasis in original). The Parties consent to the court adjudicating the Fraud Claims; however, the court questions whether the Fraud Claims, when presented in the context of this AP as opposed to a determination of the allowability of Claim 10, are sufficiently related to the Defendant's bankruptcy proceeding to permit the court's adjudication under 28 U.S.C. § 157(c). *See Harvey v. Dambowsky (In re Dambowsky)*, 526 B.R. 590, 601 n. 12 (Bankr. M.D.N.C. 2015) (citations omitted) (noting that "[w]hile the Court certainly would have jurisdiction and authority to determine these state law claims vis-à-vis the estate in the claim allowance process, the trustee (and therefore the estate) is not a party to the dischargeability action, and therefore might not be bound by its outcome").

In *Dambowsky*, the United States District Court for the Middle District of North Carolina avoided the "related to" limitation of 28 U.S.C. § 157(c) by holding that the act of liquidating underlying claims is integral to the determination of dischargeability of such claims, thus entering a judgment liquidating the claims is statutorily core under 28 U.S.C. § 157. *Id.* at 606 (citations omitted). *Dambowsky* does not specifically restrict such liquidation to proceedings where non-dischargeability is found, but the court believes the more prudent approach is to examine the Fraud Claims only to the extent necessary to adjudicate adequately the Dischargeability Claim. Only if and after the court determines that the Fraud Claims are non-dischargeable is it appropriate to liquidate the Fraud Claims. *Cf. Harris v. U.S. Fire Ins. Co.*, 162 B.R. 466, 469 (E.D. Va. 1994) (citations omitted) (holding that the bankruptcy court has jurisdiction to award money judgments on damages it determines to be non-dischargeable).

A dischargeability proceeding, including the resulting liquidation of a debt, falls within a bankruptcy court's subject matter jurisdiction as "arising in" a case under title 11; therefore, the court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). *Dambowsky,* 526 B.R. at 601-02. The court has the authority to hear this matter pursuant to the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

<u>Dischargeability Claim</u>

The Code provides that "[e]xcept as provided in section 523 . . . [a Chapter 7 discharge] discharges the debtor from all debts that arose before the date of the order for relief . . . ." 11 U.S.C. § 727(b). Section 523 contains an extensive list of the types of debts that are excepted from a discharge granted to an individual debtor. Providing a fresh start for honest debtors is one of the primary purposes of the Code. *In re Donald*, 343 B.R. 524, 539 (Bankr. E.D.N.C. 2006). The court must interpret narrowly discharge exceptions to protect a debtor's fresh start. *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 130 (4th Cir. 1999) (citing *Century 21 Balfour Real Estate v. Menna (In re Menna)*, 16 F.3d 7, 9 (1st Cir. 1994)).

Sections 523(a)(5) and (15) provide protection for certain obligations owing to a spouse, former spouse, or child of a debtor in bankruptcy. Section 523(a)(5) excepts from discharge "domestic support obligations" which are claims in the nature of alimony, maintenance or support. *In re Edinger*, 518 B.R. 859, 864 (Bankr. E.D.N.C. 2014) (citations omitted). The Plaintiff does not contend that the alleged Fraud Claims would constitute domestic support obligations but asserts that they fall within the scope of § 523(a)(15) which excepts a debt:

> to a spouse, former spouse, or child of the debtor and not of the kind described in [§ 523(a)(5)] that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court record . . . .

11 U.S.C. § 523(a)(15).[15]  This section was added to the Code in 1994 "in an attempt to lessen the chance that a divorce obligee's claims might slip through § 523(a)(5)'s cracks and be discharged unjustly." *Dressler v. Dressler (In re Dressler)*, 194 B.R. 290, 300 (Bankr. D.R.I. 1996).  The exception:

> expresses Congress's recognition that the economic protection of dependent spouses and children under state law is no longer accomplished solely through the traditional mechanism of support and alimony payments.  State courts do not always draw a sharp distinction between support and property division in providing for the postdivorce economic security of dependent family members.  Property settlement arrangements are often "important components of the protection afforded individuals who, during the marriage, depended on the debtor for their economic well-being."

4 COLLIER ON BANKRUPTCY ¶ 523.23 (Alan N. Resnick & Henry J. Sommer eds., 16th ed) (quoting *Matter of Crosswhite*, 148 F.3d 879, 887 (7th Cir. 1998)).

The Plaintiff is asking the court to find that the Defendant's alleged liability to the Plaintiff under the Fraud Claims falls within the purview of § 523(a)(15) yet repeatedly testified that he does not believe that the issues of fraud were resolved by or fell within the scope of either of the Domestic Consent Orders.  The Plaintiff insists that the Domestic Consent Orders were intended only for alimony and property division, and that he was advised by counsel that he retained causes of action against the Defendant for fraud.  The Plaintiff adamantly stated that he would not have signed the Domestic Consent Orders if he believed them to resolve the Fraud Claims.  If the Fraud Claims were not addressed by either of the Domestic Consent Orders, then these alleged debts

---

[15] This exception, as originally enacted in 1994, included a balancing test that required the court to consider the debtor's ability to pay the debt and weigh the benefit of discharging the debt against the resulting detrimental consequences to the spouse, former spouse or child of the debtor.  This statutory defense was removed by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") to make non-support obligations incurred in a divorce proceeding unqualifiedly non-dischargeable.  While most of the cases addressing § 523(a)(15) are pre-BAPCPA, the crux of the statute regarding the type of debt that is excepted from discharge is unchanged, and the pre-BAPCPA cases remain effective to this issue.

were not incurred by the Defendant in the course of her divorce from the Plaintiff as is required by § 523(a)(15).

Not to be outdone, the Defendant likewise contradicted her own position of dischargeability by asserting that any liability she might have to the Plaintiff with respect to the Fraud Claims was resolved by the Equitable Distribution Consent Order, which contained the Claims Waiver. Had the Defendant merely agreed with the Plaintiff that the Fraud Claims were not addressed by either of the Domestic Consent Orders, then the court could quickly end its inquiry and rule in favor of the Defendant on the Dischargeability Claim. With the issue raised, the court must examine the terms of the Domestic Consent Orders to determine the intent of the Parties with respect to the Fraud Claims, and whether either of the Domestic Consent Orders created any potential liability of the Defendant to the Plaintiff which is excepted from the Defendant's Discharge under § 523(a)(15).

The phrase "incurred by the debtor in the course of a divorce or separation" contained within § 523(a)(15) has been interpreted to require the creation of a *new* debt in the course of a divorce or separation that was not in existence before the divorce. *Burton v. Burton (In re Burton)*, 242 B.R. 674, 678 (Bankr. W.D. Mo. 1999) (citing *Stegall v. Stegall (In re Stegall)*, 188 B.R. 597, 598 (Bankr. W.D. Mo. 1995)). The Alimony Consent Order is restricted on its face to resolve all claims for "alimony as well as arrears for alimony, post separation support, child support, temporary child support, or attorney's fees related to those claims in their entirety." These claims are all types of domestic support obligations that are excepted from discharge under § 523(a)(5). More importantly, every obligation created by the Alimony Consent Order is owed by the Plaintiff to the Defendant. There are no debts of the Defendant to the Plaintiff reflected in the Alimony Consent Order for the court to consider as non-dischargeable under § 523(a)(15).

The Equitable Distribution Consent Order tends to be the type of an agreement or decree contemplated by § 523(a)(15) within which a non-dischargable debt can be created.  Like the Alimony Consent Order, the Equitable Distribution Consent Order does not expressly create a new obligation to be paid from the Defendant to the Plaintiff.  Therefore, if the Parties intended settlement of the Fraud Claims to be included within the terms of the Equitable Distribution Consent Order, as advocated by the Defendant, then that settlement is embodied within the allocation of property and debts between the parties.

Pursuant to the North Carolina Equitable Distribution Act ("NCEDA"), the state district court shall determine and provide for an equitable distribution of "marital property" and "divisible property."[16] N.C. Gen. Stat. § 50-20 (2013).  In an equitable distribution proceeding, marital and divisible property is divided equally "unless the court determines that an equal division is not equitable." N.C. Gen. Stat. § 50-20(c) (2013).  When determining whether an equal division of property is equitable, the court shall consider each of twelve (12) factors enumerated in N.C. Gen. Stat. § 50-20(c), including acts of either party "to waste, neglect, devalue or convert the marital property or divisible property, or both, during the period after separation of the parties and before the time of distribution" and "[a]ny other factor which the court finds to be just and proper." *Id.* When negotiating a consensual equitable distribution of property, parties can and should certainly consider these same factors.

The Plaintiff was aware of the Defendant's actions giving rise to the alleged Fraud Claims at the time the Equitable Distribution Consent Order was negotiated and executed; however, the Equitable Distribution Consent Order makes no findings of fact regarding the Defendant's actions.

---

[16] The terms "marital property" and "divisible property" are extensively defined in the NCEDA and include "all vested and nonvested pension, retirement, and other deferred compensation rights" acquired by either spouse during the course of the marriage and before the date of separation. N.C. Gen. Stat. § 50-20(a)(b)(1) (2013).

The only significant marital asset addressed by the Equitable Distribution Consent Order was the Beach House.  While the award of the Beach House to the Plaintiff perhaps appears to be an "inequitable division," the Equitable Distribution Consent Order indicates that the purpose was to allow the Plaintiff to market and sell this overencumbered property more efficiently.  Even if the award of the Beach House to the Plaintiff were intended as compensation for any liability under the Fraud Claims, the Defendant has long since deeded her interest in the Beach House to the Plaintiff, and no outstanding obligation exists for the court to find non-dischargeable under § 523(a)(15).  Similarly, the Defendant's relinquishment of interest in the Plaintiff's businesses, including Vestiq LLC, does not create new debt for dischargeability consideration.

A notable example of a § 523(a)(15) non-dischargeable debt obligation is one created as a result of a hold harmless or indemnification agreement in a divorce or separation agreement.  As explained by the United States Bankruptcy Court for the Western District of Missouri:

> [f]or example, a "new" debt is created between a debtor and his ex-spouse when, pursuant to a divorce decree, the debtor is ordered to assume a credit card debt incurred jointly during the marriage and ordered to hold the ex-spouse harmless for that debt.  If the debtor fails to pay off the credit card after the divorce, and the credit card company seeks repayment from the non-debtor ex-spouse, the debtor would have to indemnify the ex-spouse pursuant to the hold harmless agreement, thus the creation of a "new" debt to the spouse.

*Burton*, 242 B.R. at 678.  The Parties created no debt in this manner, because the Equitable Distribution Consent Order does not make any inequitable division of debts between the Parties, and the Defendant did not assume solely any individual obligations of the Plaintiff or joint obligations of the Parties.  Even if she did assume such obligations, the Anti-Indemnity Clause is a waiver by the Parties of "all claims against each other for indemnification, subrogation, or other theory which would give rise to or create civil claims against the other for joint or individual debts."

23

No outstanding liability exists, either liquidated or unliquidated, of the Defendant to the Plaintiff that was created by the Domestic Consent Orders or otherwise within the course of the Parties' separation and divorce proceedings; therefore, the Dischargeability Claim fails under § 523(a)(15).  As a result, the court need not decide whether the Claims Waiver contained within the Equitable Distribution Consent Order extinguished the Plaintiff's right to assert the Fraud Claims. The court notes, however, that to the extent that the Plaintiff retains those causes of action, any liability of the Defendant could perhaps have been adjudicated non-dischargeable under either §§ 523(a)(2) or (4) had the Plaintiff requested timely such determination.

<u>Fraud Claims</u>

Having ruled in favor of the Defendant on the Dischargeability Claim, the court declines to adjudicate fully the Fraud Claims; however, the court recognizes that the Fraud Claims could appear properly before it should the Trustee choose to renew his objection to Claim 10.  In order to aid the Trustee and the Plaintiff in assessing the allowability of Claim 10, the court will briefly summarize its initial observations with respect to the Fraud Claims, noting that the Claims Waiver may provide the Defendant with a defense to their ultimate adjudication.

Interestingly, although the Plaintiff spent a significant amount of time at the Trial presenting evidence regarding the Unauthorized IRA Withdrawals and the Defendant's failure to properly utilize the Beach Income, the Plaintiff made no specific arguments as to how the Defendant's actions constitute fraud, so the court initiated its own examination of applicable state law.  In North Carolina, "[f]raud may be actual or constructive." *Forbis v. Neal*, 361 N.C. 519, 526, 649 S.E.2d 382, 387 (2007) (citing *Watts v. Cumberland County Hosp. Sys., Inc.*, 317 N.C. 110, 115, 343 S.E.2d 879, 883 (1986)).

*Actual Fraud*

The elements of actual fraud are: "(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Id.* at 526-27, 649 S.E.2d at 387 (quoting *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974)).  The Amended Complaint alleged each of these elements in the Fraud claims, so the court assumes the Plaintiff is asserting actual fraud.[17]  The court was not persuaded by the Defendant's testimony that the Plaintiff was aware of all IRA withdrawals and that she altered forms only when she had no blank ones available.  The court finds the Defendant's actions deceitful, regardless of how she actually used the Unauthorized IRA Withdrawals.  At least with respect to the April 7th Withdrawal and the April 29th Withdrawal for which there is evidence of being procured by altered forms, the court believes that the first four (4) elements of actual fraud are satisfied.

Whether the Defendant's failure to utilize properly the Beach Income amounts to actual fraud is less clear based upon the evidence presented at the Trial.  There is no doubt that the Parties were experiencing a financial straits in 2009 and 2010, preventing the Defendant from paying timely all monetary obligations.  Giving the Beach Mortgage a lower priority than other expenses such as the Home Mortgage is understandable.  The only evidence that the Defendant was deceitful is the August 13th Withdrawal of Beach Income from the First Citizens Checking Account, but the court suspects that the Beach Mortgage was not yet in default at that time.  Although there is

---

[17] The statute of limitations for actual fraud is three (3) years, accruing at the time the facts constituting fraud are discovered by the aggrieved party. N.C. Gen. Stat. § 1-52(9) (2014).  Constructive fraud claims, however, are subject to the ten (10) year limitations set forth in N.C. Gen. Stat. § 1-56 (1951). *Dixon v. Gist*, 219 N.C. App. 630, 633 n. 1, 724 S.E.2d 639, 642 (2012) (finding that the ten-year statute of limitations set forth in N.C. Gen. Stat. § 1-56 applies to constructive fraud claims based upon breach of fiduciary duty but not to claims for actual fraud).  The Defendant's actions which the Plaintiff asserts as fraud occurred more than three years prior to the Plaintiff's Complaint.  The Plaintiff testified that he was not initially aware of the Defendant's actions but did not pinpoint a time when he became aware, only admitting that he knew of the actions at the time the Domestic Consent Orders were negotiated.

no direct evidence of the timing and amount of default under the Beach Mortgage, the Plaintiff testified that he did not become aware of the Foreclosure until late 2010, inferring that a significant default did not occur until during 2010. In addition, while purely speculative, the Online Loan Payments appear to be payments toward the Beach Mortgage which were being made timely through October, 2009.[18]

*Constructive Fraud*

Constructive fraud is based upon a confidential or fiduciary relationship in which the defendant has taken advantage of his position of trust to injure the plaintiff. *Forbis*, 361 N.C. at 528-528, 649 S.E.2d at 388 (citations omitted). "Proof of constructive fraud is less exacting than what is required for actual fraud." *Collier v. Bryant*, 216 N.C. App. 419, 432, 719 S.E.2d 70, 81 (2011) (citing *Watts*, 317 N.C. at 115-16, 343 S.E.2d at 884 (1986)). A plaintiff can establish constructive fraud by showing "(1) facts and circumstances creating a relation of trust and confidence; (2) which surrounded the consummation of the transaction in which the defendant is alleged to have taken advantage of the relationship; and (3) the defendant sought to benefit himself in the transaction." *Id.* (quoting *Sullivan v. Mebane Packaging Grp., Inc.*, 158 N.C. App. 19, 32, 581 S.E.2d 452, 462 (2003)).

When considering constructive fraud, the North Carolina Supreme Court holds that "[t]hough difficult to define in precise terms, a fiduciary relationship is generally described as arising when 'there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence.'" *Dallaire v. Bank of America, N.A.*, 367 N.C. 363, 367, 760 S.E.2d 263, 266 (2014)

---

[18] The amounts of the Online Loan Payments indicate that they were regular monthly payments on a substantial loan, most likely a mortgage in the case of individuals. The Online Loan Payments were made within the first few days of each applicable month and contemporaneously with the Citimortgage Payments, which based upon the Debtor's Schedule F, were for the Parties' Home Mortgage.

(quoting *Green v. Freeman*, 367 N.C. 136, 141, 749 S.E.2d 262, 268 (2013)) (other citations omitted).  During a marriage, a husband and wife are in a confidential relationship, and failure to disclose all material facts to one another constitutes fraud. *Lancaster v. Lancaster*, 138 N.C. App. 459, 462, 530 S.E.2d 82, 84 (2000); *see also Eubanks v. Eubanks*, 273 N.C. 189, 195, 159 S.E.2d 562, 567 (1968) (noting that "[t]he relationship between husband and wife is the most confidential of all relationships . . . .").  The Parties were certainly in a fiduciary relationship as husband and wife during 2009, which is when all of the Unauthorized IRA Withdrawals took place.  The Defendant's failure to advise the Plaintiff of these withdrawals, even if the Plaintiff would have ultimately authorized them, was a breach of confidence in this fiduciary relationship.

As suggested *supra*, the Defendant's failure to apply properly the Beach Income to the Beach Mortgage predominantly took place in 2010, after the Parties separated from their marriage.  While their marital fiduciary relationship may have ended, their joint ownership of the Beach House was akin to a partnership which also qualifies as a fiduciary relationship. *See Casey v. Grantham*, 239 N.C. 121, 124, 79 S.E.2d 735, 738 (1954) (holding that "the relationship of partners is fiduciary and imposes on them the obligation of the utmost good faith in their dealings with one another in respect to partnership affairs.").  As long as the Defendant remained in control of the Beach Income, she had a duty to the Plaintiff and to his parents to apply properly the Beach Income toward the Beach Mortgage and other expenses associated with the Beach House.

*Damages*

The court does not believe the Plaintiff established adequately that he was damaged by the Defendant's actions, as is required for actual fraud, or that the Defendant sought to benefit herself, as necessary for constructive fraud.  The Plaintiff proclaims that total amount of the Unauthorized IRA Withdrawals equates the amount that Plaintiff was damaged.  The court is abhorred by the

Defendant's actions yet sees no evidence that Plaintiff was *actually* damaged.  The Unauthorized IRA Withdrawals were all deposited into the First Citizens Checking Account, which was mainly used for payment of household expenses and the Credit Cards.  Perhaps the Defendant was using the Credit Cards for her personal benefit, but the Plaintiff presented no evidence of this beyond his own speculation.  If the Defendant had not made the Unauthorized IRA Withdrawals and that amount was still available when the Parties negotiated the Equitable Distribution Consent Order, then the Plaintiff would have only been entitled to half.  The court doubts that the amount would have be available for equitable distribution, because the IRAs were depleted by this time.  The Plaintiff provided no explanation of how the remainder of his IRAs was spent.

The court agrees with the Plaintiff that tax liability caused by the Unauthorized IRA Withdrawals is a tangible damage.  Unfortunately, the Plaintiff did not establish what amounts of the 2009 Federal Taxes and 2009 State Taxes paid by him were the direct result of the Unauthorized IRA Withdrawals.

There is no direct evidence of how the Plaintiff was actually damaged by the Defendant's failure to pay the Beach Mortgage.  The court might find the Alleged Beach Income Conversion of $54,000.00 as fact if presented with evidence beyond the Plaintiff's testimony that the Defendant admitted this amount under oath.  The court does find circumstantial evidence that in 2010, the Defendant used $50,000.00 of the Beach Income to pay the Retainer to Gurganeous, which was certainly to the Defendant's benefit.

Despite the lack of substantial evidence of actual damages, the court can award punitive damages if either actual or constructive fraud is shown. *Collier*, 216 N.C. App. at 434, 719 S.E.2d at 82.  Based upon the Defendant's behavior, this is certainly a possibility should the Fraud Claims reappear before this court.

## JUDGMENT

For the reasons set forth in this Opinion, the court orders, adjudges, and decrees the following:

1.      Judgment be, and hereby is, entered in favor of the Defendant with respect to the Dischargeability Claim; and

2.      The Fraud Claims be, and hereby are, dismissed without prejudice.

## END OF DOCUMENT